Our next case is 411-0280, Norris v. City of Waverly, which has an appearance for the appellant, Matthew Cate. Appearance of the appellee, Helen Yao, pronounced correctly. I want to thank you, counsel, both, for being present early as we request so that we can start a little earlier when our schedule permits. So, Mr. Cate, you may proceed, sir. Thank you. May it please the court? Counsel. I know your honors are going to hear appellate arguments, probably today and have been hearing them, that have greater implications upon law and greater implications maybe to a wider body. But you're not going to hear a case that has more of an implication to these particular clients. If the City of Waverly original ruling stands, my clients will be out of business. This is part of their livelihood, and so it has a great impact upon them. And we appreciate your honors hearing the appeal against Matthew. Was that ordinance, was that passed for taking care of prior to them building the building? The zoning ordinances were in effect prior to the, not prior to the original building there, but the one that was rebuilt on its ground. Yes. The one at issue here? The one at issue here, yes. There was a previous commercial building on the project previously that had burnt down. What did the owners expect? Your honor? What did they expect? Well, I think they expected to be able to have the retail sale of hay at some point. Well, is there anybody or is the ordinance or anything like that saying how you can do this? Yes, Judge, I believe that's what was set out within our brief. I believe it does fall within that. And I understand that they, and I understand your honors are all asking, well then why the heck did they try to rezone? They tried to rezone, obviously. Well, they must know they can't do this. Well, our position would be too. They had previous counsel that was advising on this, and as the Norris has testified, they were told to do so. This is a small town. I think some of you, probably all of you are aware of Waverly, Illinois. It's a small rural community. Everybody knows everybody. And as the Norris has testified, they were told to do this. Hey, don't make waves. Just get your zoning, you know, just do this and you'll be fine. No problem. No big deal. Well, lo and behold, it was a big deal, and it wasn't able to go through in this respect. But looking at the evidence that was put forth at that original hearing, the city of Waverly was focused on storage of hay. Well, of course he's storing hay if he's selling hay. I mean, just looking at that first aspect there. How in the world would he be able to sell it if it wasn't being stored somewhere? It doesn't fall under the ag provisions for storage of hay or storage of some type of ag product, because he is ultimately selling it to an in-retailer purchaser. The point being, it falls within the parameters. It does meet the parameters of the zoning for other retail sales. Remember, the zoning in itself, all zoning, is trying to classify people in groupings into similar types of groupings so that it makes sense for community planning. Now, what the city is going to do is you need to put him over into a light industrial. My goodness, light industrial where you could basically have small manufacturing firms. You could have different types of things like that. How in the world does that classify that more likely than other limited retail sales than the simple selling of bales of hay? Now, looking back again at the evidence that was presented at the original hearing, the only evidence that the city put forth that all he was doing was storing was the statements from the mayor at the time and the zoning officer, who simply stated they went by and saw hay. Well, that's not very much evidence, and I'm not saying that's competent evidence to make the ruling that it did, that all that he was doing was storing hay. They weren't able to testify what inventory was moving, if sales were being made, coming in, coming out, other types of vehicles. So I do think that when you're looking at the standard review, I realize it's high on that standard, but it's looking to what was just and reasonable in light of the evidence. Well, the evidence put forth by the Norrises is such that they were selling hay to end users, most of them agricultural users, 90%, but other people could buy hay there, too. I mean, if you or I or anyone wanted to buy a bale of hay, you could go up to the Norrises place and buy it. If you had a Halloween display or something like that, or hay rack rides, I'm trying to think of other retail sales he had at the time. Granted, most of them he's selling to farmers that want to feed their animals. He could sell to anybody. It fits within the categorization of other retail sales when you look at the other limited retail sales that they have going on within those zoning classifications. Now, you might say, well, it could fit into two of them, possibly. It could fit into the, just go with light industrial. The case law is clear on that. If it fits into two different categories, it can fit in either category. Zoning can be allowed in either. What did they ask for when they asked for the building permit? I believe the testimony, Judge, was at the time they were putting forth in the building permit that it was going to be for storage of vehicles or storage of things on trailers, I believe is what they had originally, their testimony was for and the building permit matched up to. Was that important? I think it is, Judge, but it is that the original use that they were trying to do was for that building permit. I suppose it is very important. But as the Norris has testified, he tried to do that. He did try to do that. He advertised for it. He brought forth advertisements that were shown at the hearing of how he tried to get that part done. He didn't have any success in that. So then ultimately, he did start to sell hay from that facility. He did not have the... And I think it is also important to show that it wasn't a violation of building permits. It was only in the part of the zoning so that the building permit portion, it wasn't that it was in violation of that in some nature. It was the zoning portion which would have been, if the city's contending he's violating, by not being pushed over into a light industrial usage. And I understand that council has put forth cases that state that obviously, you know, this is an ag use. They were forced into the ag use. I would agree to understand if it was hay out in the field or hay being brought in or coming out from there, you're only going to agricultural end purchasers, you might be in ag use. But now we've changed the commodity. It's become bales of hay. To take the city's argument to its most extreme, you couldn't sell eggs at the grocery store, which I know that they darn well do in the city of Waverly or the Casey's down the street. That's taking the argument to the ultimate extreme, I realize. But it's simply to show that this type of limited retail sale very well fits within it. And it's the city who came up with the zoning to begin with. And zoning is not to limit users. It is to fit the users within it. But it is never to limit or inhibit people from what they're attempting to try to do if it does fit. The last part I'd like to touch on is part of the reason they said it was a health safety concern, also a fire concern. Again, five standard review on that area. We have to show that the ultimate justice was not given in light of the competent evidence put forth. Well, the most competent evidence that was heard at that was the fire chief from the village of Waverly who said there's no greater risk for bales of hay. And instead of listening to that or taking that evidence, it was discounted. And instead they hear it from the mayor who says that basically, I'm paraphrasing, everybody knows hay burns. That's the evidence they use instead of the fire chief. Why is the fire chief's testimony pertinent to fire issues? Why does that matter? Simply because part of what they're resting their opinion on or the underlying opinion on was to show that the result of this is commercial. They claim that this is not within their zoning. What is it? Part of the city's basis, or at least they said it was being based upon, was the health safety concern of why it didn't fall within its limited retail sales and saying why it should be light industrial was because of the health safety concern that it presented by selling bales of hay. We're just trying to show that the evidence put forth, the competent evidence put forth was true. That's their concern. We don't want to have bales of hay there. Why are they required to justify that somehow with some sort of scientific evidence? I don't know. I think they were resting part of their opinion upon that in the denial that it fit within the zoning parameters that it did. So I think we're trying to put forth evidence or show the evidence that was given at the time to show that we didn't have the health safety concern, that there wasn't a concern, at least based on competent evidence, that there wasn't a concern about fire or vermin. The original order in this matter, part of what they were putting forth, was that why it shouldn't be considered a limited retail sale. So your clients were storing hay bales in the property, but because it was for retail purpose, it wasn't a violation? Because then it would fit in the other retail sales. When there's the laundry list of permitted uses, the last one being other similar limited retail sales. And if they stored the hay bales in the property for their own use, that would not be permitted? For their own use? They used it for their farming purposes to feed their own crops, or feed their own livestock. You could make an argument that there may have been an exception for personal usage. I think they would have been in trouble if they were storing it for someone else and trying to make a profit off of it. I'm trying to familiarize myself with zoning rights. I think there are different exceptions for personal usage. They knew he had a commercial operation. I think if all he was doing was warehousing or storing, he would have possibly not fallen within it. If all he was doing was storing for... I don't know if there may be an exception for storing for himself, but let's take an exception just a second a little further. Storing it for commercial purpose. For example, people pay him to store their hay there, then that would probably not fall within the other limited retail sales. So if whatever is being kept is being stored for retail sale, your argument seems to be that it falls into the commercial section of the zoning ordinance. It could very likely. Give me an example of something that wouldn't. Well, a Walmart probably may not. Other limited retail sales. You see looking at the products being sold, they're trying to limit the numbers of products, limit the wide variety of products, the wide array of products. I think you might be able to argue someone that has everything for sale under the sun may not fit under that. I think the village or the city, by its own definition, was trying to show limited retail sales, was trying to show what smaller commoditization could you possibly get. It's a single product. I understand that makes it kind of odd that it's a single product. Well, what single product would not be permitted to be sold and kept on this property that can be sold within your understanding of the zoning ordinance? I suppose you could have those issues that would be possibly because there is the underlying health safety concerns. You could have something for, I suppose, ammunition or munitions or guns or those type of things because there is a, and recalling the city zoning, which I admit I don't have myself fully familiarized with, I believe there are exceptions at the initial part of anything that doesn't fall within the, for safety issues and whatnot. But otherwise, no, I think if your other limited retail sales can be a wide catch-all. But that's the problem. You look at a lot of other zoning, and I believe one that you could look at, and I believe have looked at before, is the city of Springfield, and it's come up on different issues at least a couple times on the field. The city of Springfield, guess what? There isn't that type of catch-all there. So that is, again, part of the zoning process. It doesn't have those type of wide catch-alls. The city of Waverly does have that. And again, when you're looking at the underlying, you're always trying to look at what is the underlying reason for the zoning in question and trying to make sure that everything is basically able to develop the city in an appropriate fashion. The selling of hay at retail to end-users fits right within that. It isn't going to be something that disrupts the community in a nature that a light industrial, for example, a light industrial manufacturing facility would, or the larger scale kind of businesses would. Keeping in mind the overall parameters that they have, for example, right across the street from this very facility, it's the largest grain elevator. Why shouldn't the issue before this court be whether the conclusion of the board otherwise was unreasonable? I think it is. I think we've decided that. I mean, as far as we put forth the issues, I think that the first one in terms of were they warehousing or not, yes, that would be under that standard review. However, their interpretation of the actual zoning ordinance itself, we would argue is de novo. Why? Because the interpretation of the administrative rulings, the actual is just like interpretation of the law. It's a question of law. It's not a question of fact at that point. Why shouldn't we be deferential to the administrative agency charged on the ground with determining whether or not this particular structure should come within the interpretation or the statutory language and the examples provided? Right. And I think the case law shows you're correct. You do have, there is deferential. You do give deferential review to that. However, it's not binding on this body. You give deference to that. To say it's not binding, if we're giving deference, how wrong do they have to be before we conclude that we have to reverse it? Again, Judge, on that particular one, I would argue it's de novo standard review. I'm sorry? I would still argue that's de novo. When it's actual interpretation of the law itself, that still, I would argue, is de novo. And it's different than the ones that they have the questions of fact on or the interpretation of the evidence. Obviously, we do agree that's against manifest weight, and acknowledge that part is a high standard. But as to whether or not the current use falls within that, saying, okay, this is our set of facts, and this is the interpretations they've had, giving them the proper review, that portion then, that latter portion, then becomes de novo. And I think the case law can show that you can have, it doesn't have to be across the board, and your honors will know this, that you wouldn't have to have the same, you'd have different standards of view on different parts of the ruling. And I think that that's what enables this body to correct the wrong that was done under the law. How should we view the failed efforts by your claims to have the city rezone this area? Honestly, Judge, I'd say it's a red herring. The issue itself is a red herring. Why? I think it's because the very reason that Mr. Norris testified, when asked under oath, why did you do this? He stated, because Mayor Cleveland told me to. And I understand that Mayor Cleveland stated he does not recall that particular conversation. And again, this is where I can say that, your honors, having all been involved in different cases, and also personally, small-town politics can make memories evaporate very quickly. And I think that... Well, the trial judge thought that this was clear and unambiguous, and was not particularly sympathetic to your client's efforts. He viewed it as an effort to make an end around. I think the language he used after the property was not rezoned, just to make an end around, to get around that. Understood. And I understand that that's what... Why is it incorrect? I believe he's an incorrect judge in this particular circumstance. Because when Tom Norris, again, I'm going back to his testimony, has talked about why you do... And he was asked this under oath by the, I believe by the village's attorney, why the heck do you do that rezoning? Well, I was told to do that because it would be easier. I think he was looking at it from an attorney's standpoint, and from a cost-of-doing-business standpoint, he didn't want to rock the boat. He doesn't want to make people mad at him and say, if you do that, things are not going to go well for you. Well, he knew that. So I think it was more of a save-your-own-skin type of reasoning that he was going about that and trying to get it the way they wanted. And I believe, as he further testified to, it was supposed to be basically no problem. This is take care of everything, everything's fine. Well, of course, it then came up that it wasn't. So limited retail sales is what you're hanging your hat on here? Ultimately, yes. They exclude the description of bookstores, florists, and grocery sales? Grocery stores, also hardware stores, also that sell garden products at the hardware stores. For example, and I'm glad you mentioned that because I didn't mean to get there, I would love to see the hardware or garden store that would then sell, guess what, up front, bales of hay. I very much doubt that the City of Waverly would argue that that is not within the parameters of it under that very section. When you're buying garden products, that up front they could have sales of bales of hay. Thank you. Thank you. Thank you, Counsel. Mr. Yow? May it please the Court? Counsel. Counsel. I'm Alan Yow, and I'm here on behalf of the defendants in this case. Your Honor, it's the position of the City of Waverly that the decision of the trial court was correct and that the decision of its Board of Adjustment was correct. Namely, finding that the use of this particular premises, the Norrison, is in violation of the Zoning Code. Their property is located in a general commercial district that provides for a variety of uses, but it doesn't provide for agricultural uses. The Zoning Code that was adopted in 1992 provides for a variety of districts and allows for agricultural uses in specific districts. It doesn't prohibit agriculture, but it does limit it to about four or five different areas. The Norrisons knew this. Are there any feed stores in Waverly? Feed stores, Your Honor? Yeah. Honestly, I... Well, there is a grain storage facility, but as far as a feed store, I don't have personal knowledge as to whether or not there is one. I suspect there probably is, but I'm drawing a blank. Well, I mean, assume there was a feed store, and I can't imagine an agricultural community without having a feed store, okay? But if there's a feed store in the same commercial zoning situation as the Norrisons, I mean, there's really no difference between selling hay and selling other animal feed, is there? Well, make sure I understand the question, Judge. If that particular piece of property, that feed store, was in a general commercial district, then it wouldn't be permitted, okay? In other words, it wouldn't be. It shouldn't be. It shouldn't be on going, okay? If that piece of property, though, is actually zoned light industrial or agricultural or rural residential, sure, they could do that. But there is, here I see, perhaps no difference between the feed store and the hay. Mr. Norris testified that 99.75% of his hay is sold to dairy farms. And if you look at the testimony, they repeatedly state and agreed, one, that it's an agricultural use, that their customers are dairy farmers, that they do not pay sales tax because what they're engaged in is selling animal feed. In other words, an agricultural product. So I believe the pursuit that they're... Why does the... you mentioned the sales tax. Is that an important factor for our decision, do you think? I don't think it's crucial, Your Honor. It just goes to, I believe, one, Norris' own understanding as to what their activity really constitutes. Whether or not they pay sales tax is probably not ultimately germane as to for sure what their activity is and whether it's zoned property. But it's indicative of what their activity is and how they classify it. So why do you think it is not a limited retail enterprise, limited retail sales? Sure, Your Honor. When you look at the variety of limited retail sales there, all of them deal with the type of store that would have, for example, a storefront that would have many different types of customers, many types of different products that they're selling to a variety of consumers. In other words, household-type consumers. You have pharmacies, you have florists, you have grocery stores. You have a variety of those types of items. What Norris' are doing, however, they are selling one commodity, which they are bringing in on trucks, loading and storing the hay and then taking it back out. This is not the mom-and-pop grocery store. This is not Sue's Florist Shop. Does the record show why the Norris' decided to put this in Waverly? I mean, are they growing this hay on their own property or are they buying it from elsewhere? Or what's going on? Sure, Your Honor. My understanding from the testimony is that, well, Norris testified that, on the whole, he buys hay from other people or he contracts with others to buy the hay. Then he gets it either, I'm not sure if he actually cuts it, or at least he buys it from them. He stores it and then sells it. Although there was a little testimony from this Mr. Staten that sometimes he sold hay to Mr. Norris. So, that's, my understanding, that's how he gets the hay, is that he buys it and not necessarily raising it himself. Now, that raises an interesting question. Why did he build the facility there? Counsel, in his argument, I believe he said that, well, I believe he intended or anticipated that he could store hay there. Well, that's not the testimony. What is the testimony? The testimony Mr. Norris stated, well, I misquoted it. He stated, he testified, that he built the building to expand his hay business, his existing hay business. But the application, building permit, that he submitted, said he wanted to construct a commercial parking facility, which is a permitted use. But subsequent to that, after building it, did they use it as a commercial parking facility? No. Well, we tried to use it. What kind of demand would there be in Waverly for a commercial parking structure? Well, that's a good question. From Mr. Norris' testimony, well, he said that several people asked him, this is before he built it, he testified that, well, several people asked me, maybe we can store vehicles there. But then suddenly, after he built it, he can't get anyone to use it. Quite honestly, Mr. Norris' credibility here is not very strong. He had been to the zoning board a couple of times with counsel and denied the rezoning. Maybe, I don't know what he thought, but I think what he thought, well, you know what, I can build this, if I say it's a commercial parking facility, then I'll start storing hay. Well, that's what he did. And that's the city that obviously said, wait a minute, no, no, you were supposed to be doing a commercial parking facility, you're engaging in a hay business. And if you look at the minutes, counsel indicated that memory stayed, but if you look at the minutes that are in the record, from 2002-2003, the Norris' repeatedly were requesting rezoning so they could build and operate a hay sale business. So that's what was going on. And the city turned them down? Yes, they turned them down. And there was, if you look at the record, Your Honor, with regards to the minutes, there were petitions that were signed back in 2002-2003 by some of the landowners objecting to this. While I'm thinking about it, Your Honor, counsel indicated that there was perhaps something, a statement or testimony from the fire chief at the 2007 hearing. Fire chief didn't testify. There's no sworn testimony of the fire chief. I believe Mr. Norris made a statement to the effect that the fire chief said, well, I don't think that this built hay really has much of a fire risk. And also, the finding with regards to the hay that it poses a risk, I believe in Article 10 of the Zoning Code it talks about when the Board of Adjustment makes its findings of fact, it needs to take into account whether the proposed use says it poses a health risk, does it limit light, air, that type of thing. So part of the finding here in the decision was the fact that, from the Board of Adjustment's view, built hay posed an increased risk of harm, risk of fire. So that's why they made it. It wasn't necessarily a germane issue as to whether or not that fire risk was somehow a zoning question. I don't think that the Board of Adjustment was jumping backwards. It was just indicating as another fact that needed to be defined as to whether or not there was a health issue. Are there any additional other questions? I know I haven't used all my time, Your Honor, but I think we believe... That's not a requirement. Let me ask this question. You heard Mr. Cates' reference that how, as he explained it, Mr. Norris and Ms. Norris may have proceeded as they did because of an understanding or an indication the mayor waverly told them. Gee, if you go this way, that'll be better. What is your understanding, what the evidence showed about all of that? I believe the record... I believe that Norris has testified that, as Mr. Cates stated, that, namely, well, we didn't think we really had to do it, but the mayor... That is, had to seek a zoning change of this building once they built it? Pardon, Your Honor? They didn't think they needed to seek the zoning change? Well, they testified that they seemed to think that they could do what they wanted to do under the general commercial. Their testimony was, well, but the city was telling us differently. We had to go attempt to do light industrial. Now, I don't know what the mayor actually told them or did not tell them back in 2002 and 2003, but the Norrises were on notice that the operating the hay business there, if it wasn't zoned correctly, was improper. Mr. Cate indicated that this case has serious implications for the people involved. I agree. But this was a situation that's been created by the Norrises, not by the city of Waverly. They knew the parameters here, and they didn't get the result that they wanted. They then asked for a building permit to do another type of operation, a commercial parking facility. They built the building, and they started doing something else. Was it ever used, or was any effort even made for it to be used for commercial parking? There is a reference by Mr. Norris, the record, that he attempted to, but without success, if I recall. I believe Mrs. Norris may have suggested, maybe there was one person that used it. I'm not sure if it's much clearer than that. How big a building was this, and what did it cost? I do not know if I know the cost, Your Honor. The dimensions of the building are set forth, I believe I've set forth those in the Statement of Facts. It's a fairly large structure. Happy to answer any more questions. Well, I don't see any, Counsel. Thank you. Thank you. Okay, Mr. Cade, any rebuttal, sir? Just briefly, and for clarification, I apologize. The fire chief had not testified. It was a letter sent in for evidence. He was not available for testimony. A letter from him? A letter from the fire chief. That's correct. And I apologize. It's characterizing his actual live testimony as compared to a version that he had set forth. How big a building is this, and what did it cost to build? It was a significant cost, Judge. I don't have the exact dollar figures. It was a new, metal-side style building. The parameters of the building, I don't have readily available. Does the record show what effort, if any, was made to use it for the designated purpose for which it was built? Yes, I believe there was limited testimony, and I believe Counsel is correct. I believe the testimony is that one or two people actually did pay for it. But the idea was basically to have, there was some hope to do, for example, tractors or other types of equipment that could be stored there, rather than at the agricultural sites, he'd be able to grab that overflow, and possibly also, the other big one was to do campers and such. Because there really isn't that availability in the Waverly area right now. He advertised for it. Unfortunately, they didn't come. As his wife testified too, I believe it was her testimony that only one or two had actually paid for it, that a bunch of people wanted to use it for free. Now, a skeptic would say, is picking up on the theme that you initiated, Waverly is a small town. Right. Before I build a big metal structure at a substantial cost for the purpose of designating this commercial parking, I might want to see what the market is for that in advance, as opposed to putting it up, advertising, oh, there's no market, maybe I'll go. Who would have seen it coming? Storing, bail, hey. I understand. I'm a skeptic, just as your honors are. And that's why I think, that's why we tried to come out with that testimony to show, did you actually get somebody to pay you to do this? Did you actually get, and they said, you know, we got one or two. They did say that they had a bunch of interest beforehand, but most of that consisted of farmers saying, oh sure, we'll use it and that kind of stuff, or that kind of thing. He never did the, he should have done more legwork to follow up and make sure, yeah, is this realistic or not, I'm actually going to get paid for this. I hope that, I mean, the reason also that he wasn't able to go forth on that, he did have a number of people that wanted to use it for storage, but for free. So, I mean, that's... But that's not going to be helpful if I put up a building.  That was part of the problem. That's, I mean, that's how you end up, unfortunately, the situation that we're in. A couple of just quick points, because I know I'll be limited on time here. Okay. Is that the, again, looking at the general, again, at that list, and I apologize for not touching this better on the first point, which was when you're looking at the hardware store, it also mentions right after it, the garden supplies and whatnot. I do think it's very serious that you have, it's basically being told if you could expand it, maybe sell hay and, you know, bales of hay and some other stuff. And shovels. It would be okay. Actually, and this sounds ridiculous, but council's advice was, you know, Tom, why don't you start selling the garden air fresheners and stuff up on the front counter you've got up front. You've expanded, and now you're in more of a, now you look, you have more limited retail sales. You're more like the garden store down the street. That fits. So, I think he's being punished in a way for having the more limited sales, in that sense. But, my goodness, if he expanded it, like the hardware store, which has the garden thing on the side of it, then he'd be okay. And again, he is, and you look at zoning, again, it's to keep all things consistent. Right across the street is, again, the largest grain storage facility in Waverly. That's what actually sets a shadow on top of his building. Just add to that. And all persons, the majority of persons actually signed a petition, the last time actually, in favor of his continued ability to sell. Does that matter? No. Probably not. Not until the next election. Yeah. Understood. Well, thank you, council. We'll take this matter into advice.